CURTIS A. BROCK,

        Plaintiff,

v.

        CIVIL ACTION NO. 2:06-CV-78
        (The Honorable Robert E. Maxwell)

MICHAEL J. ASTRUE,[1]
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## OPINION/REPORT AND RECOMMENDATION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Defendant," and sometimes "Commissioner") denying his claims for Supplemental Security Income ("SSI") under the Social Security Act ("Act"), 42 U.S.C. §§ 401 et seq. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I. PROCEDURAL HISTORY

Curtis A. Brock, hereinafter referred to as "Plaintiff" or "Claimant" or "Brock," filed his Application for SSI benefits on July 7, 2004, alleging an onset of disability on December 25, 2000.

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be substituted, therefore, for former Commissioner Jo Anne B. Barnhart (or Acting Commissioner Linda L. McMahon [if the caption was changed previously]) as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. §405(g).

That application was initially denied on September 2, 2004. Brock timely filed a Request for Reconsideration on September 28, 2004. On December 8, 2004, Brock filed a Request for Hearing. On December 29, 2005, a video hearing was held before Administrative Law Judge Karl Alexander. On February 24, 2006, the ALJ issued an unfavorable decision. On March 3, 2006, Brock requested Appeals Council review of the unfavorable decision. On July 20, 2006, the Appeals Council denied review, making the decision of the Administrative Law Judge the decision of the Commissioner. Thereafter, Brock timely filed the within civil action.

## II. FACTS

In his July 7, 2004, application SSI benefits, Plaintiff alleged onset of disability due to chronic back pain and a numbness in fingers and left arm as of December 25, 2000. Plaintiff was fifty-one years of age at the time he filed the subject application for benefits. (R. 52-72, 93).

Plaintiff was treated by Bradley Friend, a Parsons, West Virginia, Doctor of Chiropractic Medicine, for the period from June 2, 2003, to September 21, 2005.

A MRI of Brock's thorasic spine on February 19, 2001, was negative (no evidence of herniation of disc material seen). (R. 140).

A dynamic motion x-ray of Brock's thorasic and lumbar spine on February 20, 2003, revealed "mild osteoarthritis, dextro-scoliolsis" with respect to the thorasic spine and "negative dynamic motion x-ray of the lumbar spine." (R. 138-139).

Kip Beard, M.D., evaluated Plaintiff for West Virginia Disability Determination Service on November 10, 2003. Dr. Beard noted: "[e]xamination of the cervical spine, flexion and extension is normal. Lateral bending and rotation to the right is normal. The claimant complains of pulling on the left nex on lateral bending to the left. This is limited to 40 degrees. Rotation is limited to 75

2

degrees to the left with pulling of the neck There is no tenderness or spasms." Dr. Beard's examination of Plaintiff's arms, knees, ankles and feet was completely normal. Dr. Beard reported "some mildly diminished lumbar lordosis" on examination of the lumbar/sacral spine and hips. He noted no paravertebral tenderness, no spasm, normal motion flexion, extension, lateral bending and ability to stand on one leg or the other, and no leg length discrepancy. He also noted normal straight leg raising but hamstring tightness at 80 degrees in the supine position. The hips were normal. Dr. Beard noted no muscle weakness or loss of sensation in Plaintiff's extremities. In summary, Dr. Beard opined: "Examination today reveals some discomfort on motion testing but preserved motion. There is some paravertebral muscular tenderness without spasm. Neurologic exam reveals no radiculopathy. There is some mild motion loss of the neck associated with some pulling in the left side of the neck but no evidence of myelopathy or radiculopathy. . . . Regarding the left upper extremity paresthesias, the examination is unrevealing." (R. 125-128). Under social history, Dr. Beard reported that Brock "drinks about a sick-pack [sic] of beer per day." (R. 126).

Dr. Ghazala Kazi of Tri-Sate Occupational Medicine, Inc., evaluated Brock on March 15, 2004, relative to a worker's compensation claim. Dr. Kazi noted under personal history that "[t]he claimant completed the tenth grade. He smokes one pack of cigarettes per day and denies the use of alcohol." Dr. Kazi noted that Brock walked unassisted and had a normal gait. Finding that Brock had reached maximum medical improvement from his work related injury of 2000; that no further medical or surgical intervention would change his condition; that four years of weekly chiropractic treatments and physical therapy and eighteen months of physical therapy had failed to relieve his complaints of pain; that an MRI of the cervical spine, completed on February 19, 2001, was essentially normal; that x-rays of the lumbar spine, taken December 26, 2000, one day after the

3

December 25, 2000, work related injury, showed degenerative arthritis of the lumbar spine with possible muscle spasm but no evidence of current compression or fracture or any other bony abnormalities; Dr. Kazi recommended cessation of chiropractic care, no work hardening and an award of an additional 3% disability on top of the 12% disability rating previously awarded. (R. 130-134).

Brock was treated at the Elkins Physical Therapy & Sports Injury Clinic, by Paul Calvert, P.T., for a period of time beginning October 9, 2001. Initial evaluation noted subjective complaints of pain 5/10 and negative MRI and x-rays. Lumbar and cervical screens were negative. The quadrant sign and symmetric strength tests were also negative. Although Brock complained of loss of sensation in his left hand, it was not provoked by movement of the physical therapist. However the physical therapist noted scapular dyskinesia with movement and forward flexion of the left shoulder with significant scapular winging and upper trap. Basically the physical therapist found "significant scapular weakness and lateral neck tightness" and ordered progressive strengthening. (R. 141-142).

Friend Family Chiropractic records reflect treatment of Brock on 6/2/03, 6/9/03, 6/12/03, 6/16/03, 6/23/03, 6/30/03, 7/7/03, 7/18/03, 7/25/03, 8/12/03, 5/28/04, 6/4/04, 6/16/04, 6/25/04, 7/7/04, 7/16/04, 7/21/04, 7/28/04, 8/6/04, 8/13/04, 8/18/04, 8/25/04, 9/5/04, 9/10/04, 9/15/04, 9/24/04, 10/1/04, 10/6/04, 10/07/04, 10/15/04, 10/22/04, 10/29/04, 11/5/04, 11/12/04, 11/19/04, 11/24/04, 11/29/04, 12/3/04, 12/8/04, 12/13/04, 12/15//04, 12/22/04, 12/29/04, 1/3/05, 1/12/05, 1/19/05, 2/11/05, 2/16/05, 2/25/05, 3/4/05, 3/11,05, 3/18/05, 3/23/05, 3/28/05, 4/6/05, 4/15/05, 4/26/05, 5/4/05, 5/13/05, 5/20/05, 5/27/05, 6/3/05, 6/10/05, 6/17/05, 6/22/05, 6/29/05, 7/6//05, 7/13/05. 7/26/05, 8/3/05, 8/10/05, 8/17/05, 8/26/05, 9/2/05, 9/9/05, 9/16/05, and 9/21/05. (R. 143-

149 and 163-166 and 176-180).

An state agency medical consultant performed a physical residual functional capacity assessment review based on Brock's records as of August 30, 2004, finding: ability to occasionally lift and carry fifty pounds, frequently lift and carry twenty-five pounds, stand and or walk for six out of eight hours, sit with normal breaks for sic out of eight hours, unlimited push or pull, no postural limitations, no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations. The reviewer concluded "some decrease in range of motion. Claimant takes no meds. Claimant is partially credible. Physical evidence indicates claimant can perform med. [medium] type of activity." (R. 150-157).

Friend Family Chiropractic records reflect treatment of Brock

Bradley Friend, D.C., wrote Brock's lawyer on July 13, 2005, stating: Brock's "diagnosis is chronic sprain/strain injuries to the lumbar and thoracic spine"; "Brock's condition would not permit him to lift 10-20 lbs. throughout a workday. Standing and walking 2-4 hours during a work day might be more easily tolerated, but this would depend on the surface he would be working on. Any exertion on the muscles and tendons in his back will lead to inflammation in that tissue. Mr. Brock would not be capable of being a reliable employee. If he were to over exert his back at all he would have to take to rest and recuperate from the irritation to the adhesions in the connective tissue in his back. Mr. Brock would require frequent breaks and the opportunity to ice his back to control the inflammation in his back. Mr. Brock would likely have to miss work on a regular basis (one or two days a week) to recover from any over exertion of the muscles and tendons in his back." The chiropractor bases his opinion on the following: 1) his prolonged treatment of Brock as herein noted; 2) the results of an IME performed by Dr. Lester and two FCE's performed by David Lee, P.T.,

5

which were accepted by worker's compensation in its award of a permanent impairment rating of 12-14%; and 3) "orthopedic tests performed during examination after his injury in December 2000." He explained Brock's subjective complaints[2] of pain in the following manner: "He may have what some would consider to be a low tolerance for pain . . . . Mr. Brock's injuries may not have caused serious injury to the joints or intervertebral discs of the spine, but by definition a sprain/strain injury involves the muscles, tendons, and ligaments. The damage is to the connective tissue. In the process of healing the connective tissue is bound up by adhesions or scar tissue. The scar tissue is not as pliable as the normal healthy tissue and when exerted upon the scar tissue will easily become inflamed. The inflammatory process will cause a great deal of pain, but worse yet is the fact that the inflammatory process will cause more adhesions to form in tissue." (R. 161-162).

Thomas Stein, Ed.D., conducted an evaluation of Brock for West Virginia Disability Determination Service on August 15, 2005. His assessments included a clinical interview, Mental Status Examination, Wechsler Adult Intelligence Scale and Wide Range Achievement Test. During the clinical interview, Brock told Stein that he "has drank the same amount from age 18 to the present and that is typically 6 to 12 beers a day. He says that he has been drinking at that level for 33 years. In the past 12 months he has been drinking 6 to 12 beers a day." Brock's verbal IQ was 84; his performance IQ was 68; and his full scale IQ was 75. The WRAT-3 scores were 68 for reading, 59 for spelling and 72 for arithmetic, the equivalents of fourth grade, third grade and fourth grade levels, respectively, leading Stein to the conclusion that Brock's Axis II was: "Borderline intellectual functioning." However, with respect to Brock's borderline intellectual functioning, Stein noted: "[n]o problems if instructions are given verbally; but he has limited (4th grade) reading skills.

_____

[2]Lack of objective evidence.

Dependent personality (traits)." He found Brock's concentration "mildly deficient"; persistence "mildly deficient"; and his pace "moderately slow." Stein recommended that if benefits were awarded to Brock, he would have to have a fiscal agent to assist him in handling his financial affairs "because of his alcohol dependence problem of drinking 6 to 12 beers every day." With respect to Brock's alcohol dependence, Stein noted: "[h]e is alcohol dependent; however it is unlikely that ETOH contributes to back pain, borderline intelligence, or his dependent traits." (R. 168-176, 174). Stein found Brock: not limited with respect to his ability to understand and remember short, simple instructions and to carry out short simple instructions; slightly limited with respect to his ability to understand, remember and carry out detailed instructions and in his ability to make judgments on simple work-related decisions.

The remainder of the record in this case (R. 190-234) is the transcript of a hearing before an ALJ, Judge Getty, relative to a claimant, Leroy A. Sargent of the state of Maine, which record has nothing to do with the matter now before the Court.

The hearing in the subject case was held before ALJ Karl Alexander on December 29, 2005. Plaintiff appeared in person and by his counsel, Travis Miller. Tim Moller, a vocational expert ("VE"), appeared and gave testimony without objection. The exhibits which are a part of the original record were also admitted without objection.

Brock testified he completed the ninth grade, making C's and D's (R. 194); he had trouble pronouncing words and reading some of the letters that he got from Social Security and he had his mother help him fill out some of the social security forms (R.195); he stopped using his own checkbook because he overwrote checks (wrote bad checks) (R. 195); he worked on a crew for a remodeling contractor (Jack Halendar); he worked for his brother as a mechanic changing tires and

oil for about five years; he worked for Jack Halendar as a timber cutter for about a year; and he worked on a ski lift for a brief period of time (eight days) until he was injured on December 25, 2000. (R. 196-200). Brock testified he went to a chiropractor once a week for treatment of his back pain after the work-related injury. He described his pain as severe and daily until he would go to the chiropractor. He did not take any medication other than over-the-counter Advil because medicine did not help. (R. 200-201). His chiropractor recommended a regime of walking exercises, which Brock did not follow except sporadically because it felt like he had a "ton of bricks" on his low back when he did walk. Brock also testified he would not "even attempt to lift or carry anything." (R. 202-203). However, he also testified that he sometimes carried wood in for his mother and could "just lift anything, but I could only do it for about 5 minutes on account of the scar tissue." (R. 204). Brock lived by himself in a big house on his mother's property. He cleaned the floors, dishes, bathrooms and whatever needed to be done. He did not cook or do laundry. He did the grocery and prescription shopping for his mother and the grocery shopping for himself. He has a driver's licence and drove his own car. (R. 205-207). Brock testified he drank "one to two six packs or a fifth of wine and a six pack" each day and that he had been doing that all of his life. (R. 209).

The VE testified that Brock's prior work as a carpenter's helper was characterized by the DOT as heavy semi-skilled work, his prior work as an auto mechanic's helper was heavy semi-skilled work and his work as a timber cutter was heavy unskilled work. (R. 211). The ALJ and counsel for Brock posed the following hypothetical questions to the VE and the VE responded:

Q.   "[A]ssume a hypothetical individual of the Claimant's age, educational background and work history; would be able to perform medium work; should work in a low stress environment with no production line type of pace or independent decision making responsibilities; would be limited to unskilled work involving only routine and repetitive instructions and tasks with no reading, grading or spelling required or math. Would there be any work in the regional or national economy that would –

8

such a person could perform?

A.  "At the medium level, I could offer the following jobs. There are vehicle washers ... dishwashers ... janitors ... laundry workers. . . . These are all medium and unskilled jobs. . . ."

Q.  "[L]et's say it would reduce to the exertional level for the light and add a sit/stand option and then retain the other limitations."

A.  "At the light level with a sit/stand option ... there are inspector checkers ... laundry folders ... sorters and graders. . . . These are all light unskilled jobs with a sit/stand option."

Q.  "[I]f an individual were limited to lifting 10 pounds or less and walking between only two to four hours during a day, what exertional category would that place them in?"

A.  "Typically the sedentary level exertion."

Q.  "[L]et's say as a base we take the light hypothetical that you previously discussed and we add to that that the individual would require frequent unscheduled breaks throughout the workday and also would miss two to three days per month. Would there be any jobs for such an individual?"

A.  "No."

### III. ADMINISTRATIVE LAW JUDGE DECISION

1.  The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 416.920(b)).

2.  The claimant has the following severe impairments: chronic low back strain; chronic low back myofascial pain; borderline intellectual functional; dependent personality traits; and alcohol dependence (20 CFR 416.929(c)).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.  After careful consideration of the entire record, the undersigned finds that the claimant has the following residual functional capacity: he is able to perform medium work; should work in a low stress environment with no production line type of pace or independent decision making responsibilities; is limited to unskilled work involving only routine and repetitive instructions and tasks; and work not requiring any reading, writing, spelling or math.

5.    The claimant has no past relevant work performed at a substantial gainful activity level (20 CFR 416.965).

6.    The claimant was born on December 29, 1953, and is currently 52 years old, which is defined as closely approaching advanced age (20 CFR 416.963).

7.    The claimant has a limited ninth grade education and is able to communicate in English (20 CFR 416.964).

8.    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national economy that the claimant can perform (20 CFR 416.960(c) and 416.966).

10.   The claimant has not been under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR 416.902(g)).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were

10

the case before a jury, then there is 'substantial evidence.'" *Hays*, 907 F.2d at 1456 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

Plaintiff contends:

1) The ALJ erred by failing to find that Brock's condition meets the requirements for Listing 12.05C.

2) The ALJ erred by failing to properly address the issue of alcohol.

3) The ALJ erred by improperly rejecting the treating source opinion.

4) The ALJ erred by failing to apply the proper standard in making his credibility analysis, as is required by Social Security Ruling 96-7p.

Commissioner Contends:

1) Substantial evidence supports the ALJ's finding that Plaintiff could perform the medium and light work identified by the VE.

2) Plaintiff's condition does not meet Listing 12.05C.

3) The ALJ properly considered the evidence of Plaintiff's alcoholism.
4) The ALJ properly considered the opinion of Plaintiff's chiropractor.

5) The ALJ properly considered Plaintiff's credibility.

## C. Listing 12.05

ALJ Alexander concluded that "Listing 12.05 for mental retardation is not applicable" to Brock's case. He reasoned: "in a psychological consultative evaluation on August 15, 2005, performed by psychologist Thomas Stein, Ed.D., the claimant had a performance IQ of 68.

11

However, there are no school records or other evidence prior to age 22 showing IQ scores of 70 or less, or deficits in adaptive functioning, in part because apparently the school burned down or at least the records did, according to counsel. So there is no evidence of an IQ of 70 or less with deficits in adaptive functioning before age 22, which is required by Listing 12.05."

"Listing 12.05 Mental Retardation: Mental retardation refers to significantly subaverage general intellectual functioning **with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.** (Emphasis added by the undersigned.)

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied:

A.    Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;

Or

B.    A valid verbal, performance, or full scale IQ of 59 or less;

Or

C.    **A valid verbal performance or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;**

Or

D.    A valid verbal, performance, or full scale IQ of 50 through 70, resulting in at least two of the following:
1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration." (emphasis added by the undersigned).

12

The proper inquiry is:

1. Did Brock establish that he suffered "subaverage general intellectual functioning?"

2. If so, did Brock establish that he had "**deficits in adaptive functioning?**"

3. Did Brock establish his subaverage general intellectual functioning and deficits in adaptive functioning were "**initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22?**"

4. If so, did Brock establish his mental retardation was such that it meets or exceeds one of the four levels of required severity, i.e. "A," "B," "C" or "D"?

The ALJ in this case did not conduct the required analysis as will be more fully explained below. Instead he erred as a matter of law in assuming the Listing was not met because there was no evidence in the record of IQ testing during the developmental period. He also improperly assumed alcohol consumption led to decreased IQ scores in Brock, a factual conclusion not supported by the evidence in the record.

In response to Brock's claims, the Commissioner now argues that Dr. Stein diagnosed borderline intellectual functioning, not mental retardation and thereby "precluded a finding that Plaintiff has the 'deficits in adaptive functioning' required by the listing." (D.E. 20, p. 12). The Commissioner correctly argues that "it is possible to diagnose mental retardation in individuals with IQ's between seventy and seventy five 'who exhibit significant deficits in adaptive behavior'" and "'[c]onversely, Mental Retardation would not be diagnosed in an individual with an IQ lower than seventy if there were no significant deficits or impairments in adaptive functioning.'" DSM-IV at 40.

The evidence is not in dispute that Brock's valid test scores reflected his verbal IQ was 84; his performance IQ was 68; and his full scale IQ was 75. The evidence is not in dispute that Stein diagnosed "borderline intellectual functioning."

13

Brock argues his performance IQ of 68 is less than 70, and, therefore, he has met the first prong of the four-prong test: "subaverage general intellectual functioning."

Neither party provided the Court with any definitive authority concluding that a finding of borderline intellectual functioning as opposed to mental retardation precluded a finding of deficits in adaptive functioning.

The undersigned believes such a conclusion is too narrow and not supported by the structure of the Listing. Nowhere in the Listing is there a statement that the diagnosis of "borderline intellectual functioning" precludes a finding of "mental retardation." To the contrary, the plain language of the Listing defines mental retardation as: 1) "significantly subaverage general intellectual functioning" 2) "with deficits in adaptive functioning" 3) "initially manifested during the developmental period." As previously noted, the listing leaves the severity of the disorder (mental retardation) issue to whether the requirements of "A," "B," "C" or "D" of the Listing are met.

The IQ number is an indicia of "subaverage intellectual functioning." As previously noted, it is only one of three elements that must converge in the reaching of a conclusion of mental retardation.

20 C.F.R. Part 404, Subpt. P., App. 1 § 12.00 (D)(6)(c) in pertinent part provides:

. . . In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05.[3]

An additional requirement under the Listing, however, is that the evidence demonstrate or

---

[3]See also *Kennedy v. Heckler*, 739 F.2d 168 (4th Cir. 1984) (the regulations mandate that when a single IQ test produces multiple scores, the lowest score is to be used in conjunction with § 12.05).

support onset of impairment before age of twenty-two. Brock concedes the IQ test results were obtained when he was approximately fifty years of age. There is no evidence to support a finding that he had ever had an IQ test prior to that time. Brock's explanation is that his school records were destroyed when the one room school he attended burned down. Therefore, he cannot demonstrate or support onset of the impairment before age twenty-two.

Brock argues, however, that where the IQ is indeed borderline as described in the Listing, and where he has a significant other impairment, this clearly would result in no less impairment than a person who could show a borderline IQ prior to age twenty-two.

This argument is without merit. The Listing clearly and unambiguously requires that "the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. 404, Subpt. P, App. 1, § 12.05.

The difficulty is, however, that many people do not take an IQ test before age twenty-two, if ever. The Fourth Circuit discussed this problem in *Branham v. Heckler*, 775 F.2d 1271 (4th Cir. 1985), where the Court stated, "we think that there may be many reasons why an individual would not have had the opportunity or need to have a formal intelligence quotient test until later in life. The fact that one was not earlier taken does not preclude a finding of earlier retardation." This means that, despite the lack of an earlier IQ test, the ALJ may find that the onset of Brock's impairment was before age twenty-two. Conversely, he may find that the onset of his impairment was after age twenty-two. In other words, his IQ had changed for some reason. However, because IQ is considered "a lifelong condition," Id., we assume, lacking any evidence to the contrary, that Brock's IQ had not changed.

ALJ Alexander did find: "[f]urthermore, the claimant is and has been alcohol dependent for

a long time and, of course, it is well known that excessive alcohol consumption over a long period of time can definitely lead to a decrease in IQ scores." (R. 18). While the record is replete with mentions of Brock's lifetime of alcohol dependence and abuse, the only expert qualified[4] to render an opinion on the subject, psychologist Stein, noted: "[H]e is alcohol dependent; however it is unlikely that ETOH contributes to back pain, borderline intelligence, or his dependent traits." (R. 168-176).

The ALJ does not discuss Stein's opinion relating to alcohol and its relationship to Brock's borderline IQ or rationalize why it should not be considered. The ALJ does not explain why he, the ALJ, is qualified to render a dispositive opinion. "In the absence of any psychiatric or psychological evidence to support his position, the ALJ simply does not possess the competency to substitute his views on the severity of plaintiff's psychiatric problems for that of a trained professional." *Grimmett v. Heckler*, 607 F. Supp. 502, 503 (S.D. W.Va., 1985) citing *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974) and *McLain v. Schweiker*, 715 F.2d 866, 869 (4th Cir. 1983).

As counsel for Brock appropriately points out in his memorandum in support of Brock's motion for summary judgment (D.E. 17, p. 9), "the N.D. Illinois Court relying on the Seventh Circuit held, '[i]f an ALJ indulges his layman's view of a disorder in lieu of an expert opinion, the ALJ's decision lacks evidentiary support **and must be returned to the Administration for further proceedings**.'" *Wiggins v. Apfel*, 29 F.Supp.2d 486 (1998)(emphasis added by the undersigned).

Dr. Stein was less than definitive with respect to what role, if any, alcohol abuse played in Brock's subaverage general intellectual functioning than Brock's counsel's argument would lead the

---

[4]ALJ Alexander characterized Stein in the Unfavorable Decision as follows: "Based upon Dr. Stein's psychological evaluation, which is the only mental health evidence by an acceptable medical source in the record, ...." (R. 18)

Court to believe. All Stein said was that "it is unlikely that ETOH contributes to back pain, borderline intelligence, or his dependent traits." (R. 174). "[U]nlikely" does not necessarily mean that alcohol did not contribute to Brock's subaverage general intellectual functioning. Given that Brock admitted he abused alcohol "all his life" and at least since age 18 and Stein was less than clear with regard to his opinion as to what role the alcohol abuse played in Brock's subaverage general intellectual functioning, additional consultative examinations would have been appropriate.

Brock argues that because: 1) "he lives next door to his mother and . . . he relies upon her for assistance with reading his mail and with all of his paperwork, including his social security"; 2) "he does not have a checkbook and . . . when he did, he could not maintain it properly"; 3) "he failed two grades and only completed the ninth grade before dropping out at the age of 17"; 4) "valid WRAT-3 testing . . . indicated [he] was reading, spelling, and performing math at no higher than 4th grade level, (D.E. 21, p. 2) he has established the required connective link between subaverage general intellectual functioning and deficits in adaptive functioning initially manifested during the developmental period.

Certainly each of the four examples cited by Brock are subject to interpretations that are different than they are the result of subaverage general intellectual functioning. Dr. Stein noted Brock "completed the 9th grade before quitting at age 17 because, 'I hated school.'" He further noted that Brock "was in regular classes," "he repeated two grades in the elementary level," "his grades were C's and D's and he was never involved in extracurricular activities." (R. 169). Whether the evidence in the record of this case supports a conclusion that Brock decided to quit school because he had subaverage general intelligence functioning or that he quit school because he simply hated school and he legally could is an issue of fact for the ALJ which was not addressed by him in the

17

underlying unfavorable decision..

Whether Brock's limited reading ability is evidence of deficits in adaptive functioning initially manifested during the developmental period or is a manifestation of his espoused hatred of school is also a question for the ALJ which was not addressed by him in the underlying unfavorable decision.

The question of whether Brock's not having a checkbook or not maintaining one properly when he did have one is evidence of a subaverage general intellectual function which manifested itself in adaptive behavior during the development period is also a question for the ALJ and not the Court which was not addressed by the ALJ in his underlying unfavorable decision. First, it is not known from the record in this case when Brock did have a checkbook and when he had problems with a checkbook. Second, with respect to problems with a checkbook, Brock testified as follows: "Q. What – how did that go? Were you able to handle the checkbook today? A. No. Q. What happened? A. I overwrote checks. Q. Did you bounce checks? A. Yeah." There is nothing in the colloquy that evidences his bouncing of checks was the result of subaverage general intelligence. It must be considered that Dr. Stein was concerned about Brock handling his own money. In his report, Dr. Stein noted: "In the event that disability benefits are awarded, this claimant is in need of a fiscal agent to assist him in handling his financial affairs because of his alcohol dependence problem of drinking 6 to 12 beers every day." (R. 172 and 175). Dr. Stein does not opine that Brock cannot handle his own financial affairs because of any subaverage general intelligence problem. Dr. Stein's opinion clearly relates to the future based on Brock's present and historical abuse-of-alcohol conduct.

Finally, whether living next door to one's mother or relying on her to assist one with

paperwork is the result of subaverage general intelligence or whether it may be the result of Brock's "dependent traits" as noted by Dr. Stein (R. 174) is a question for the ALJ, which was not addressed by him in the underlying unfavorable decision.

It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence. The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

Accordingly, the undersigned finds that while Brock meets part of the first prong of "subaverage general intellectual functioning" by virtue of his performance IQ of 68, he has not carried the burden of establishing that his subaverage general intelligence was connected with deficits in adaptive functioning which initially manifested themselves during the developmental period. The undersigned further finds that the ALJ incorrectly applied the law with respect to the absence of IQ test scores prior to age twenty-two in his analysis of Brock's 12.05 claim.

### D. Alcohol

20 C.F.R. §§ 404.1535, 416.935 requires:

(a)    General. If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability.

(b)    Process we will follow when we have medical evidence of your drug addiction or alcoholism.
    (1)    The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.
    (2)    In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or

19

alcohol and then determine whether any or all of your remaining limitations would be disabling.

In this case, the ALJ wrote: "Based upon Dr. Stein's MSS, **along with the claimant's alcohol** dependence, and giving him the maximum benefit of the doubt even though he is not very credible, the Administrative Law Judge has limited the claimant to unskilled work in a low stress environment with no production line type or pace or independent decision making responsibilities, involving only routine and line type of pace or independent decision making responsibilities, involving only routine and repetitive instructions and tasks, and not requiring any reading, writing, spelling or math." (Emphasis added by the undersigned.) (R. 21). In an earlier portion of the ALJ's analysis of the record evidence, he noted: "He also walks up to a mile during the summer, passed a written test for his drivers license, drives his car to go grocery shopping with his mother, carries the groceries for his mother, frequently gets together with friends and drinks up to 12 beers or a fifth of wine daily. These activities do not seem to the undersigned to be consistent with total disability. Furthermore, the claimant testified and reported to the psychologist that he has consumed at least a six-pack of beer on a daily basis all of his life, but denied using any alcohol to an examining doctor during an independent medical examination on March 15, 2004, which greatly detracts from his credibility." (R. 19). A more damning statement is made by the ALJ at the outset of his analysis: "The claimant appears to be greatly exaggerating his subjective complaints for secondary gain in order to obtain disability benefits so that he can continue his long-time lifestyle of rarely working and constantly drinking." (R. 18).

The above three quotes are interspersed within the ALJ's thorough analysis of the record. In paragraph 4, the ALJ considered Brock's credibility from his reported work history standpoint; from the standpoint of subjective complaints v. objective evidence in the medical record; and from

20

inconsistencies in the record with respect to reported activities of daily living. Based on that analysis, the ALJ concluded that Brock "has medically determinable impairments that could reasonably be expected to cause some back pain and personality difficulties from time to time, but not to the frequency and severity alleged." (R. 19). In particular, the ALJ considered the vertebrogenic imaging studies conducted by the IME, which showed no significant abnormalities; the physical examination of the IME, which was essentially normal except for some reduced range of motion due to subjective complaints of pain, a negative straight leg raising in the sitting position as opposed to the supine position, which is a Waddell sign indicative of symptom magnification, and a neurological evaluation that was normal; and Dr. Beard's November 10, 2003, consultative physical examination of Brock, which was normal, except for lubrosacral tenderness on motion testing, a normal neurological examination, with no evidence of radiculopathy and no clinical signs supporting any upper extremity paresthesias. The ALJ also reviewed the treatment records of the chiropractor, Dr. Friend. The ALJ characterized the actual records as "essentially illegible." (R. 20)[5]. The ALJ analyzed that Brock had seen the chiropractor more than three hundred times over four (4) years with no improvement except on the day of treatment. The ALJ considered that Brock took no prescribed medications for pain. (R. 20). The ALJ considered the residual functional capacity assessments of August 30, 2004, and November 29, 2004. The ALJ considered that Brock had not sought or received any mental health treatment; that the mental status evaluation performed by Dr. Stein was essentially normal except for mildly impaired immediate and remote memory and moderately impaired recent memory and concentration was average. He also considered that Brock

---

[5]The undersigned reviewed the same medical records and found them to be mostly a series of coded numbers and, accordingly, reached the same conclusion as did the ALJ. They are essentially illegible to one not familiar with the codes used by the chiropractor's office.

had a driver's license he earned by taking a written test. The ALJ did not consider Dr. Stein's diagnosis of pain disorder because it is not supported by the medical evidence and is contradicted by the other findings of Dr. Stein that Brock engaged in a wide range of activities of daily living. The ALJ considered Dr. Stein's assessment of mildly deficient social functioning, mildly limited concentration, mildly limited persistence and moderately slow pace. He also considered Dr. Stein's assessment that Brock had the ability to do all work-related activities with no limitations except for slight limitations regarding detailed instructions or making work-related decisions and that instructions would have to be given verbally due to his borderline intellectual functioning and limited reading skills. (R. 20).

While it is difficult for the undersigned to divorce the ALJ's statements concerning Brock's alcohol use from his analysis of the record evidence relating to disability, it is not impossible for the undersigned to determine that the ALJ found Brock not disabled from the substantial objective evidence in the record without actually considering the impact, if any, of his alcoholism. In short, separating the objective facts from the opinions, substantial evidence supports the ALJ's finding "that the claimant has the following residual functional capacity: he is able to perform medium work; should work in a low stress environment with no production line type of pace or independent decision making responsibilities; is limited to unskilled work involving only routine and repetitive instructions and tasks; and work not requiring any reading, writing, spelling or math." (R. 18). The scope of appellate review is limited to whether the factual findings of the Secretary are supported by substantial evidence. 42 U.S.C.A. §§ 405(g), 1383(c)(3); *Richardson v. Perales,* 402 U.S. 389, 401 (1971).

However, such a finding is not dispositive of the 12.05 inquiry. As this Court has held, the

additional limitation "need not be disabling in and of itself." *Branham,* 775 F.2d at 1273. "[T]he inquiry is whether the claimant suffers from any additional physical or mental impairment significantly limiting work-related functions." *Kennedy v. Heckler,* 739 F.2d 168, 172 (4th Cir.1984).

### E. Treating Source Opinion

It is not disputed that Brock's treating source is a chiropractor.

It cannot be disputed that a chiropractor is not "an acceptable medical source" under the regulations. 20 C.F.R. §416.913(e) provides:

> (e)     In addition to evidence from the acceptable medical sources listed in paragraph (a) of this section, we may use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work or, if you are a child, how you typically function compared to children your age who do not have impairments. Other sources include, but are not limited to–
>
> (1)     Medical sources not listed in paragraph (a) of this section (for example, nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists.

"Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it." *Craig v. Chater,* 76 F. 3d 585, 589 (4th Cir. 1996).

The treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Mitchell v. Schweiker,* 699 F.2d 185 (4th Cir. 1983). In *Craig v. Chater,* 76 F.3d 585, 590(4th Cir. 1996), the Fourth Circuit held:

"Circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Hunter v. Sullivan,* 993 F.2d 31, 35 (4th Cir. 1992).

23

20 C.F.R. § 404.1527 reads:

> (d) *How we weigh medical opinions*. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion:
>
>> (1) *Examining relationship*. Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>>
>> (2) *Treatment relationship*. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(I) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.
>>
>>> (I) *Length of the treatment relationship and the frequency of examination*. Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a umber of times and long enough to have obtained a longitudinal picture of your impairment, we will give

the source's opinion more weight than we would give it if it were from a non treating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability.* The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. . . .

(4) *Consistency.* Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

The Fourth Circuit has held that: "[a]lthough it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it." *Craig v. Chater*, 76 F. 3d 585, 589 (4th Cir. 1996). The treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Mitchell v. Schweiker*, 699 F.2d 185 (4th Cir. 1983).

A physician's opinion that a claimant cannot work or is disabled cannot be given controlling weight or even special consideration. See Social Security Ruling ("SSR") 96-2p. However, that Ruling also provides:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

In the instant case, the ALJ explained that he did not give the opinion of the chiropractor weight because "not only because he was not an acceptable medical source, but also because it [his opinion] is devoid of objective support in the medical evidence of record." (R. 20). The ALJ also points out where the opinion of the chiropractor was at odds with other medical opinions of Dr. Kazi, who performed and IME relative to Brock's worker's compensation claim found only 15% disability as opposed to total disability, and Dr. Beard, a state agency physician, who examined Brock and whose opinions differ from those of Brock's chiropractor. (R. 19-20) (R. 125-134). 20 CFR § 404.1527(f)(2)(i) provides:

> Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists. However, State agency medical or psychological consultants, or other program physicians or psychologists, are highly qualified physicians and psychologists who are also experts in Social Security disability evaluations. Therefore, administrative law judges must consider findings of State agency medical or psychological consultants, or other program physicians or psychologists, as opinion evidence, except for the ultimate determination about whether you are disabled.

Similarly, the ALJ is not bound by the treating sources opinion on the ultimate issue of disability, an issue which is reserved to the Commissioner.

> (e) *Medical source opinions on issues reserved to the Commissioner.* Opinions on some issues, such as the examples that follow, are not medical opinions, as described in paragraph (a)(2) of this section, but are, instead, opinions on

issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; *i.e.,* that would direct the determination or decision of disability.

(1) *Opinions that you are disabled.* We are responsible for making the determination or decision about whether you meet the statutory definition of disability. In so doing, we review all of the medical findings and other evidence that support a medical source's statement that you are disabled. A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled.

(2) *Other opinions on issues reserved to the Commissioner.* We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to this subpart, your residual functional capacity (see §§404.1545 and 404.1546), or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

The undersigned finds that substantial evidence[6] in the record supports the ALJ's allocation of no weight to the opinions and particularly the opinion on the ultimate issue of disability by Brock's treating chiropractor.

### F. Credibility

Credibility determinations are for the ALJ to make and such findings are given great deference "[b]ecause he had the opportunity to observe the demeanor. . . ." *Shively v. Heckler,* 739 F.2d 987, 989-990 (4th Cir. 1984).

20 C.F.R. §416.929 outlines the requirements for consideration of credibility issues:
(a)     General. In determining whether you are disabled, we consider all your

---

[6]Substantial evidence is defined as "... evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.' " *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir.1966)

symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence, and other evidence. By objective medical evidence, we mean medical signs and laboratory findings as defined in § 416.928(b) and (c). By other evidence, we mean the kinds of evidence described in §§ 416.912(b)(2) through (6) and 416.913(b)(1), (4), and (5), and (d). These include statements or reports from you, your treating or nontreating source, and others about your medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work (or, if you are a child, your functioning). We will consider all of your statements about your symptoms, such as pain, and any description you, your treating source or nontreating source, or other persons may provide about how the symptoms affect your activities of daily living and your ability to work (or, if you are a child, your functioning). However, statements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled. In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings and statements about how your symptoms affect you.

In *Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1984), the Fourth Circuit held:

> . . ., the ALJ did not just rest on the absence of objective proof of pain. In an extended, comprehensive discussion, he cited many additional reasons, all derived from the circumstances of Mickles' everyday life, for finding her testimony not credible.

> (3) Mickles used only relatively mild over-the-counter medication for her joint pain, . . . .

> The only fair way to weigh a subjective complaint of pain is to examine how the pain affects the routine of life. *See Hunter v. Sullivan*, 993 F.2d 31 (4th Cir. 1992) (claimant's failure to fill prescription for painkiller, which itself was indicated for only mild pain, and failure to follow medical and physical therapy regimen supported ALJ's inference that claimant's pain was not as severe as he asserted).

In the instant case, the ALJ, like *Mickles*, considered that the:

1)   "claimant has had an abominable work history; he has no substantial gainful activity in the past fifteen years, which is not consistent with his work history report that he worked was [sic] a carpenter from 1971 to at least 1999." (R. 18).

2)   "[d]espite the claimant's extreme subjective complaints of pain reported to the Social Security Administration and that he testified to at the hearing, the acceptable medical sources have rarely reported objective clinical signs of any significant physical impairment. . . ." (R. 19).

3)   "there is no evidence of any condition that would cause his hand to go numb; . . ." (R. 19).

4)   "the claimant is prescribed no medications, taking only Advil for pain. . . ."

5)   "The Claimant also reported in his activities of daily living and testified he"
    a.    [d]id all the housework.
    b.    [h]as no problems with personal care.
    c.    [p]rimarily prepares his meals.
    d.    [w]alks up to a mile during the summer.
    e.    [p]assed a written test for his driver's license.
    f.    [d]rives his car to go grocery shopping.
    g.    [c]arries groceries for his mother.

Based upon the above findings, the ALJ explained that he did "not accept medical findings or opinions that are based solely or primarily on the claimant's subjective complaints that appear to be the case with the assessment by the claimant's chiropractor Bradley Friend, D.C." (R.19). The ALJ proceeded to point to objective findings and non-findings, already noted herein from the record, which further undermines Brock's claims of pain and disability and the opinions of Dr. Friend.

Accordingly, the undersigned finds substantial evidence supports the ALJ's credibility findings and conclusions.

## V.  RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's

applications for DIB is based on the ALJ's incorrect application of the law with respect to the absence of IQ test scores prior to age 22 in his analysis of Brock's 12.05 and a lack of substantial evidence connecting Brock's borderline intelligence with alcohol abuse. I accordingly recommend the Defendant's Motion for Summary Judgment be **DENIED,** and the Plaintiff's Motion for Summary Judgment be **GRANTED, in part**, by reversing the Commissioner's decision under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Commissioner for further proceedings consistent and in accord with this Recommendation.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _2/_ day of August, 2007.

JOHN S. KAULL
U. S. MAGISTRATE JUDGE